3 P.3d 936 (1999)
197 Ariz. 16
U S WEST COMMUNICATIONS, INC., a Colorado corporation, Plaintiff-Appellant,
v.
ARIZONA CORPORATION COMMISSION, an agency of the State of Arizona; Renz D. Jennings, Marcia Weeks and Carl J. Kunasek, as members of the Arizona Corporation Commission, Defendants-Appellees,
Sprint Communications, Inc.; AT&T Communications of the Mountain States, Inc.; MCI Telecommunications, Inc.; TCG Phoenix; Arizona Payphone Association, Intervenors-Appellees.
No. 1 CA-CV 97-0517.
Court of Appeals of Arizona, Division 1, Department B.
May 18, 1999.
Review Denied April 18, 2000.[*]
*937 *938 U S West Law Department by Norton Cutler, William M. Ojile, Jr., Denver, Colorado, and Wilmer, Cutler & Pickering by Louis R. Cohen, Jonathan R. Frankel, Washington, D.C., and Fennemore Craig, P.C. by Timothy Berg, Theresa Dwyer, Phoenix, for Plaintiff-Appellant.
Arizona Corporation Commission by Janet F. Wagner, Janice M. Alward, Phoenix, for Defendants-Appellees.
Osborn Maledon, P.A. by Andrew D. Hurwitz, Joan S. Burke, Phoenix, for Intervenors-Appellees TCG Phoenix, AT&T Communications of the Mountain States, Inc.
AT&T Communications of the Mountain States, Inc. by Maria Arias-Chapleau, Mary Tribby, Denver, Colorado, for Intervenor-Appellee AT&T Communications of the Mountain States, Inc.
Lewis and Roca LLP by Patricia K. Norris, Thomas H. Campbell, W. Todd Coleman, Phoenix, for Intervenor-Appellee MCI Telecommunications, Inc.
Ridge & Issacson, P.C. by Steven J. Duffy, Phoenix, for Intervenor-Appellee Sprint Communications, Inc.

OPINION
RYAN, Judge.
¶ 1 For more than eighty years, U S WEST Communications, Inc. ("U S WEST") and its predecessor have had a monopoly in providing local telephone service in Arizona. Recently, the process to change this situation in the local telecommunications field was begun. This appeal presents questions arising out of these first steps to introduce competition in the local telecommunications field.
¶ 2 U S WEST challenges the Arizona Corporation Commission's ("Commission") rules setting the structure to allow other telecommunications companies to compete for customers. U S WEST argues that the promulgation of those rules constituted a breach of contract. It also asserts that the rules were improperly adopted because the Commission failed to obtain approval of the attorney general. The trial court agreed with the Commission on both issues. We hold that the rules do not establish a breach of contract. We also hold that some of the rules were not properly adopted under the Arizona Administrative Procedure Act. Thus, we affirm in part, reverse in part, and remand with directions.

I.
¶ 3 U S WEST and its predecessor have provided telephone service in Arizona since statehood. In 1912, the Commission created a monopoly for providing telephone service in favor of U S West's predecessor. The companies subsequently invested billions of dollars in establishing and maintaining the infrastructure necessary to provide that service, including local and intraLATA long distance service.[1] The monopoly appears to be *939 nearing its end, however, with the advent of competition in the field.
¶ 4 On June 23, 1995, the Commission issued Decision No. 59124, in which it adopted the Competitive Telecommunications Rules ("competitive rules"), Arizona Administrative Code R14-2-1101 to -1115. (The rules are attached as an appendix to this opinion.) In general, the competitive rules allow telecommunications providers to apply for certificates of convenience and necessity ("CC&Ns") to enter into competition with U S WEST in providing local and intraLATA long distance service.[2] Several companies Sprint Communications, Inc. ("Sprint"); AT&T Communications of the Mountain States, Inc. ("AT & T"); MCI Telecommunications, Inc. ("MCI"); TCG Phoenix; and Arizona Payphone Association applied for and were granted CC&Ns to compete with U S WEST in various areas.
¶ 5 U S WEST intervened in the CC&N application proceedings filed by AT&T, MCI, and Sprint. In none of the cases did U S West either introduce evidence or file information that would meet the filing requirements for rate cases, universal service fund cases, or competitive services classifications.
¶ 6 Later, U S West sued the Commission alleging, among other things, that the Commission breached U S West's contract with the State and that the enactment of the competitive rules violated the Arizona Administrative Procedure Act. MCI, TCG Phoenix, and Arizona Payphone Association intervened in the suit. U S West also filed separate lawsuits against AT&T and the Commission, MCI and the Commission, and Sprint and the Commission. These lawsuits challenged the Commission's grant of competitive CC&Ns to AT&T, MCI, and Sprint. These latter cases were consolidated with U S West's original action against the Commission.
¶ 7 U S WEST filed a motion for summary judgment arguing in part that the Commission's rules breached its "contract" with the State and that the competitive rules were invalid because they were not approved by the attorney general, as required by the Arizona Administrative Procedure Act, before filing with the Secretary of State. The Commission filed a response and cross-motion for summary judgment. TCG Phoenix joined in the Commission's response and cross-motion. AT&T filed a separate response and a motion to dismiss. MCI filed a motion to dismiss and also joined in AT&T's motion to dismiss and in the Commission's and AT&T's response.
¶ 8 The superior court denied U S WEST's motion for partial summary judgment and granted the Commission's cross-motion for summary judgment and the motions to dismiss filed by AT&T and MCI. U S WEST appeals. U S WEST does not appeal from the dismissal of its claims against AT&T and MCI.

II.

A.
¶ 9 Before we reach U S West's substantive claims, we must address the Commission's argument that U S WEST's complaints are not ripe for review because U S WEST has not requested rate relief. If a party has not exhausted its administrative remedies, the controversy is not ripe for review and the court will not intervene in the *940 dispute. See Arizona Downs v. Turf Paradise, Inc., 140 Ariz. 438, 445, 682 P.2d 443, 450 (App.1984). Here, we believe that whether this matter is ripe for review is predominately a legal question. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (holding that an agency's determination of whether a statute was properly construed was a purely legal issue, and therefore ripe for review), abrogated on other grounds by Califano v. Mister Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). We review legal issues de novo. See Libra Group, Inc. v. State, 167 Ariz. 176, 179, 805 P.2d 409, 412 (App.1991).
¶ 10 Part of U S WEST's breach of contract argument is that the Commission's action allows competitors to capture its most lucrative customers, which will result in substantial loss to the corporation. The Commission responds that there are mechanisms in place, both within the competitive rules and in U S WEST's ability to request rate relief, that will avoid any unfair reduction in U S WEST's income. The Commission contends that if U S WEST would request such relief, the Commission could respond with appropriate measures to ensure that U S WEST receives a fair rate of return. Because U S WEST has not requested such rate relief, the Commission argues that U S WEST has not exhausted its administrative remedies and this dispute is not ripe for judicial review. We disagree.
¶ 11 U S WEST asserts that its relationship with the State is contractual and focuses on two principal terms of this purported contract. First, the State promised U S WEST a monopoly. Second, in exchange for U S WEST's promise to serve all Arizona customers, both profitable and unprofitable, the Commission would set rates that, in the aggregate, would allow U S West to make a profit.
¶ 12 The monopoly requires U S West to serve customers for whom the cost of service is so high that the Commission has elected not to allow U S WEST to recover the entire cost of service from those customers. Instead, the cost of these customers' service is subsidized by other customers, for whom the Commission has set higher rates. It is the lower-cost, higher-rate customers for whom the competitors will naturally compete. As U S WEST loses some of these customers, its mix of customers will swing from the profitable to the non-profitable, reducing its per-customer income at the same time its per-customer costs increase. It will thus not be able to recover a fair rate of return on its property devoted to public service.
¶ 13 U S WEST argues that the Commission's action allowing other telecommunications companies to compete for its more lucrative customers breaches a material term of the contract. It points to the negative effects of competition on its profits to demonstrate that the promise of a monopoly is a material term. It argues that one party's breach of a material term excuses the other party from its obligation to perform under the contract. See Zancanaro v. Cross, 85 Ariz. 394, 400, 339 P.2d 746, 750 (1959).
¶ 14 The Commission argues that U S WEST can file a rate case to adjust the rates it can charge its remaining customers. An adjustment would allow U S West to rebalance the mix to allow a fair rate of return. This adjustment would permit it to compete with the new competitors in the competitive markets and thereby increase profits. Until U S WEST requests such rate relief, the Commission contends, this dispute is not ripe for review because U S WEST has not exhausted its administrative remedies.
¶ 15 U S WEST's argument, however, requires us to make the legal determination of whether a contract exists between U S WEST and the State and whether the State breached a material term of that contract when the Commission eliminated the protection against competition afforded U S West in its service territory. It does not matter whether U S WEST will be able to adjust rates to achieve a fair rate of return. If the promise of exclusivity is a material term of the supposed contract, and the State has breached that contract, then U S WEST may be excused from performing its obligations under the contract. Thus, U S West would not have to incur expenses nor consume time obtaining rate relief. We therefore hold that U S WEST's claim for breach of contract is ripe for judicial review.

*941 B.
¶ 16 We also hold that U S WEST's argument that the Commission improperly bypassed the attorney general approval process is ripe for judicial review. Over U S WEST's objections, the Commission promulgated the competitive rules. U S WEST then filed a request for rehearing, which was denied by operation of law when it was not granted within twenty days of the issuance of the rules. See A.R.S. § 40-253(A). U S WEST then filed this action, challenging the enactment of the competitive rules. The procedures it followed comply with the statute providing for judicial review:
[A]ny party in interest, or the attorney general on behalf of the state, being dissatisfied with an order or decision of the commission, may within thirty days after a rehearing is denied or granted, and not afterwards, commence an action in the superior court ... to vacate, set aside, affirm in part, reverse in part or remand with instructions to the commission such order or decision on the ground that the ... rule... is unlawful, or that any rule ... provided in the order is unreasonable.
A.R.S. § 40-254(A). U S WEST has sufficiently exhausted all of the available administrative remedies in its challenge to the adoption of the competitive rules.

III.
¶ 17 U S WEST asserts that it provides telephone service within Arizona as the result of a regulatory contract with the State. It argues that the Commission could not simply command it to provide the service at specified rates; instead, U S WEST agreed to do so in exchange for the State's promise of protection from competition. U S WEST cites the following for the proposition that it has a contract with the State for providing telephone services:
By the issuance of a certificate of convenience and necessity to a public service corporation the State in effect contracts that if the certificate holder will make adequate investment and render competent and adequate service, he may have the privilege of a monopoly as against any other private utility. Trico's right to maintain its distribution lines in the area of its certificate, and to make extensions therefrom to customers resulting from the development of the area served by it, is a vested property right, protected by Article 2, Section 17, of the Arizona Constitution.
Application of Trico Elec. Coop., Inc., 92 Ariz. 373, 380-81, 377 P.2d 309, 315 (1962).[3] U S WEST also cites to Northern Pacific Railway Co. v. North Dakota, 236 U.S. 585, 595, 35 S.Ct. 429, 59 L.Ed. 735 (1915):
Broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the [utility's] property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the [utility] has expressly or impliedly assumed.
See also James P. Paul Water Co. v. Arizona Corp. Comm'n, 137 Ariz. 426, 429, 671 P.2d 404, 407 (1983) (stating that the public service corporation receives a monopoly in return); Arizona Corp. Comm'n v. Southern Pac. Co., 87 Ariz. 310, 350 P.2d 765 (1960) (commenting that the public service corporation gives up the right to set its own rates and to abandon unprofitable lines); Simms v. Round Valley Light & Power Co., 80 Ariz. 145, 149, 294 P.2d 378, 380 (1956) (stating that the public service corporation receives in exchange the right to a fair overall return on its property devoted to public service); Scates v. Arizona Corp. Comm'n, 118 Ariz. 531, 533-34, 578 P.2d 612, 614-15 (App.1978) (same).
¶ 18 U S WEST's argument is flawed. The nature of U S WEST's relationship with the State through the Commission is not contractual. The cases upon which U S West *942 relies were speaking descriptively or metaphorically; none holds that there is an actual contract, for breach of which the law of contracts gives a remedy. U S WEST has cited no authority that holds that there is an actual contract or that contract remedies are available under these circumstances.
¶ 19 Courts are reluctant to find that statutes create private contractual rights. "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that `a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting Dodge v. Board of Educ., 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)). The Commission granted U S WEST its monopoly acting under the constitution and laws of this State. Nowhere do these laws indicate any legislative intent to create a regulatory contract with U S WEST.
¶ 20 An enforceable contract is formed through an offer, an acceptance, consideration, and sufficient specification of terms. See K-Line Builders, Inc., v. First Fed. Sav. & Loan Ass'n, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App.1983). The party asserting the existence of a contract bears the burden of proof. See Graham v. Asbury, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975); Berthot v. Security Pac. Bank of Ariz., 170 Ariz. 318, 324, 823 P.2d 1326, 1332 (App.1991). U S WEST has not carried its burden.
¶ 21 Several of the characteristics of an actual contract are missing here. First, there is no bargained-for exchange. When the Commission granted U S WEST's predecessor the exclusive right to provide telecommunications services, it did so under the prevailing theory of a regulated monopoly. When the Commission, under the 1912 Public Service Corporation Act, see Laws 1912, Ch. 90, ordered consolidation of telephone service in 1912, it neither considered nor rejected a proposal not to grant exclusivity if the provider accepted competition.
¶ 22 Second, there is no term to the supposed contract. If there were true freedom of contract here, the contract would be limited in time and the Commission would be free to seek other providers at the end of the term. However, Arizona law does not allow the Commission this freedom. Once granted a CC&N, a public service corporation cannot be divested of it unless it fails to continue to meet the qualifications. See James P. Paul Water Co., 137 Ariz. at 429, 671 P.2d at 407.
¶ 23 Simply because in dicta the regulated monopoly arrangement has been likened to a contract does not mean a contract was created. In fact, many of the government's relationships with individuals and companies can be likened to contracts. For example, it could be said that in exchange for a license to practice medicine, a physician agrees to maintain the necessary skills and qualifications, and to practice in a proficient and careful manner. If the physician "breaches" this agreement, the State takes away the license, but this is done under administrative law, not under contract law.
¶ 24 We therefore conclude that U S WEST has failed to state a claim for breach of contract. The superior court did not err in granting summary judgment on this point.

IV.
¶ 25 U S WEST also claims that the Commission improperly bypassed the attorney general in adopting the competitive rules. A challenge to the validity of a rule is a question of law, subject to de novo review. See Dioguardi v. Superior Court, 184 Ariz. 414, 417, 909 P.2d 481, 484 (App.1995).
¶ 26 The legislature has enacted two methods under the Arizona Administrative Procedure Act to review rules enacted by state agencies. Certain agencies are subject to oversight by the Governor's Regulatory Review Council. See A.R.S. §§ 41-1051 to -1057 (Supp.1998). The Commission's rules are not subject to council oversight, however. See A.R.S. § 41-1057(2). They are therefore subject to review by the attorney general to ensure that they are clear, concise, understandable, in proper form, and within the *943 agency's power to make. See A.R.S. § 41-1044(A). The attorney general's review is set forth in A.R.S. section 41-1044:
A. The attorney general shall review rules that are exempt pursuant to § 41-1057.
B. Rules that are exempt pursuant to § 41-1057 shall not be filed with the secretary of state unless the attorney general approves the rule as:
1. To form.
2. Clear, concise and understandable.
3. Within the power of the agency to make and within the enacted legislative standards.
4. Made in compliance with the appropriate procedures.
C. Within sixty days of receipt of the rule the attorney general shall endorse the attorney general's approval on the rule package. After approval, the attorney general shall file the rule package with the secretary of state.
D. If the attorney general determines that the rule does not comply with subsection B of this section, the attorney general shall endorse the attorney general's disapproval of the rule on the rule package, state the reasons for the disapproval and within sixty days after receipt of the rule return the rule package to the agency that made the rule.
Rules are invalid if not adopted and approved in accordance with the procedure outlined above. See A.R.S. § 41-1030(A).
¶ 27 The Commission bypassed attorney general review and filed the competitive rules directly with the secretary of state. The Commission determined that the competitive rules were not subject to review by the executive branch because they emanated from its ratemaking powers. This determination was based on the Commission's reading of State ex rel. Corbin v. Arizona Corporation Commission, 174 Ariz. 216, 848 P.2d 301 (App.1992).[4]
¶ 28 The Commission's powers and duties are set forth in the Arizona Constitution as follows:
The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations. . . .
Ariz. Const. art. 15, § 3. The Commission's powers are limited to those declared in the constitution and implementing statutes. See Tonto Creek Estates Homeowners Ass'n v. Arizona Corp. Comm'n, 177 Ariz. 49, 55, 864 P.2d 1081, 1087 (App.1993). The supreme court has "`repeatedly held that the power to make reasonable rules and regulations and orders by which a corporation shall be governed refers to the power to prescribe just and reasonable classifications and just and reasonable rates and charges.'" Id. at 56, 864 P.2d at 1088 (quoting Williams v. Pipe Trades Indus. Program of Ariz., 100 Ariz. 14, 17, 409 P.2d 720, 722 (1966)).
¶ 29 The Arizona Constitution grants the legislature certain power over the Commission under the following provision:
The law-making power may enlarge the powers and extend the duties of the Corporation Commission, and may prescribe rules and regulations to govern proceedings instituted by and before it; but, until such rules and regulations are provided by law, the Commission may make rules and regulations to govern such proceedings.
*944 Ariz. Const. art. 15, § 6. Corbin held that this provision does not grant the legislature the right to confer on the executive branch the power to review and reject the Commission's rules and regulations reasonably related to its ratemaking function. 174 Ariz. at 219, 848 P.2d at 304. The Commission relies upon Corbin in arguing that the competitive rules are not subject to attorney general review because they implicate the Commission's ratemaking function.[5]
¶ 30 The Commission argues that all the competitive rules are related to ratemaking. We disagree. Some rules clearly are related to the ratemaking power. See Rules R14-2-1109 ("Pricing of Competitive Telecommunications Services"), R14-2-1110 ("Competitive Telecommunications Services Procedures for Rate Change"), and R14-2-1113 ("Establishment of Universal Service Fund"). Rule R14-2-1108 ("Determination of a Competitive Telecommunications Service") is also clearly within the Commission's plenary power to establish classifications.
¶ 31 Other rules arguably implicate ratemaking. Rule R14-2-1115 (D)-(F), providing for Commission oversight of accounting records, implicates ratemaking as review of accounting records would allow the Commission to determine whether the company has complied with ratemaking orders. Rule R14-2-1107 requires companies to seek Commission approval to discontinue or abandon competitive services. Abandoning or discontinuing some competitive services can affect a company's profit and loss, and thereby affect its charges for other services. Cf. Arizona Corp. Comm'n v. State ex rel. Woods, 171 Ariz. 286, 295, 830 P.2d 807, 816 (1992) (stating that the Commission had regulatory power permitting it to require information regarding, and power of approval over, utilities' transactions with affiliates because such transactions could damage the utilities' assets leading to a request for higher rates).
¶ 32 But we conclude that some rules are not reasonably related to classification or ratemaking. Rules R14-2-1103 through -1106 deal with CC&Ns. Rule R14-2-1103 requires telecommunications companies to obtain a CC&N to engage in competitive services; Rule R14-2-1104 provides for expanding the CC&N for a telecommunications company with existing tariffs;[6] Rule R14-2-1105 provides for granting an initial CC&N for a company that is not already providing telecommunications services; Rule R14-2-1106 sets forth grounds for denying CC&Ns and sets conditions to the CC&Ns that are issued. We believe these rules are not related to a plenary power of the Commission. Thus, these rules are not exempt from legislative oversight, such as attorney general review for matters of form, clarity, and compliance with authorizing legislation. See A.R.S. § 41-1044(A).
¶ 33 In Tonto Creek, we invalidated a Commission action purportedly transferring a CC&N from one corporation to another, on the grounds that no statute authorized such an action. 177 Ariz. at 56, 864 P.2d at 1088. We held that a statute was necessary because "[i]ssuing certificates of convenience and necessity is far from a plenary power of the Commission. To the contrary, it is a legislative power delegated to the Commission subject to restrictions as the legislature deems appropriate." Id. (citing Corporation Comm'n v. Pacific Greyhound Lines, 54 Ariz. 159, 177, 94 P.2d 443, 450 (1939)).[7] *945 Similarly, the competitive rules not reasonably related to ratemaking are not within the Commission's plenary power, and are therefore subject to legislative constraints such as attorney general review.
¶ 34 The Commission argues that Corbin exempts these rules from attorney general review, contending that issuing such CC&Ns simply sets a classification for competitive services, which it argues is a reasonably necessary step in ratemaking. See Consolidated Water Utils., Ltd. v. Arizona Corp. Comm'n, 178 Ariz. 478, 483-84, 875 P.2d 137, 142-43 (App.1993). We reject this argument.
¶ 35 The issuance of a CC&N may be incidentally related to ratemaking. This incidental relationship, however, is not enough to exempt the rules from attorney general review. If it were, then the Commission would have the plenary power to issue CC&Ns, a proposition we rejected in Tonto Creek. While we agree that the Commission has the exclusive power to determine classifications, such as competitive services, the Commission does not have plenary power to issue a CC&N to a company to engage in that service. Granting CC&Ns is a power the legislature has granted to the Commission. As such, rules related to the issuance of CC&Ns are subject to legislative control, and hence are subject to review by the attorney general under A.R.S. section 41-1044.
¶ 36 We also conclude that other rules do not relate at all to ratemaking or classification. Rule R14-2-1111 requires local exchange carriers to provide equal access for customers to choose long distance services. Rule R14-2-1112 requires local exchange carriers to "provide appropriate interconnection arrangements with other telecommunications companies." Rule R14-2-1114 requires companies to "provide quality service in accordance with this rule and with any other service quality requirements established by the Commission." Rule R14-2-1115 (A)-(C), (G)-(I) establishes administrative requirements. These are not reasonably related to the ratemaking function. We also disagree with the Commission's argument that the provisions of Rule R14-2-1114 relating to billing and collection from customers implicate ratemaking. Billing and payment terms apply after the rates have already been established.
¶ 37 In summary, while some of the competitive rules do reasonably relate to the Commission's plenary constitutional powers, others do not. These latter rules are instead provisions as to which the legislature granted the Commission power to act. The Commission may not insulate from review rules that are otherwise subject to attorney general review merely by enacting them with rules relating to its plenary powers. The Commission erred in bypassing the attorney general's review as to some of these rules. As a result, those rules are invalid.[8]See A.R.S. § 41-1030(A).
¶ 38 The Commission argues that A.R.S. section 41-1044 is unconstitutional because it allows the attorney general to determine whether the Commission has the legal authority to promulgate its rules. According to the Commission, placing this power in the hands of an official of the executive department usurps the power of the judiciary, and thus violates separation of powers. See Ariz. Const. art. 3. This argument is meritless. The statute only gives the attorney general the power to make a determination whether the rules are within the Commission's power to enact and whether the rules are in proper form, are clear, concise, understandable, and comply with appropriate procedures. Nothing in the statute purports to usurp the judiciary's role in interpreting the laws and constitution of this State. Judicial review of the attorney general's decision is available. See Woods, 171 Ariz. at 299, 830 P.2d at 820 (ordering attorney general to certify Commission rules).

*946 V.
¶ 39 U S WEST's claims are ripe for review. We hold, however, that it has failed to state a claim for breach of contract. On the other hand, the Commission improperly bypassed the statutory requirement that the attorney general review and approve those rules not reasonably related to service classification and ratemaking. These conclusions make it unnecessary to address whether U S WEST is improperly seeking injunctive relief or whether U S West's position on the contract issue is preempted by federal law. We do not find U S WEST's pursuit of this action unjustified, groundless, or harassing, and therefore reject TCG Phoenix's request for attorney's fees under A.R.S. sections 12-341.01(C) and 12-349.
¶ 40 The trial court's judgment that U S WEST has no cause of action for breach of contract is affirmed. The ruling that the competitive rules were not subject, in part, to review and approval by the attorney general is reversed. This matter is remanded to the trial court with directions to order the Commission to submit the invalidly promulgated rules to the attorney general for review under A.R.S. section 41-1044.
CONCURRING: WILLIAM F. GARBARINO, Judge, and REBECCA WHITE BERCH, Judge.

Appendix

Arizona Administrative Code, Title 14

ARTICLE 11. COMPETITIVE TELECOMMUNICATIONS SERVICES
Note: Each rule contains the following Editor's Note and Historical Note:
Editor's Note: The Arizona Corporation Commission has determined that the following Section is exempt from the Attorney General certification provisions of the Arizona Administrative Procedure Act (A.R.S. § 41-1041) by a court order (State of Arizona v. Arizona Corporation Commission, 114 Ariz. Adv. Rep. 36 (Ct.App.1992)).

Historical Note
Adopted effective June 27, 1995, under a court-ordered exemption as determined by the Arizona Corporation Commission (Supp.95-2).

R14-2-1101. Application of Rules
These rules shall govern the provision of competitive, intrastate telecommunications services to the public by telecommunications companies subject to the jurisdiction of the Arizona Corporation Commission. Unless otherwise ordered by the Commission, these rules shall not govern the provision of service by independently or local exchange carrierowned pay telephones (COPTs) and alternative operator service (AOS) providers, which shall instead be governed by Articles 9 and Article 10 of this Chapter, respectively. The provision of local exchange service also shall be governed by Article 5 of this Chapter, to the extent that Article is not inconsistent with these rules.

R14-2-1102 Application of Rule
[In this[1]] Article, unless the context otherwise requires, the following definitions shall apply:
1. "Arizona Corporation Commission" or "Commission." The regulatory agency of the state of Arizona having jurisdiction over public service corporations operating in Arizona.
2. "Bona Fide Request." A written request submitted by a telecommunications company to a local exchange carrier for intraLATA equal access service or for interconnection arrangements.
3. "Central Office." A facility within a telecommunications system where calls are switched and which contains all the necessary equipment, operating arrangements, and interface points for terminating and interconnecting facilities such as subscribers' line and interoffice trunks.
4. "Competitive Telecommunications Service." Any telecommunications service *947 where customers of the service within the relevant market have or are likely to have reasonably available alternatives.
5. "Docket Control Center." The Commission section responsible for the acceptance and processing of all applications and other filings, and for official record maintenance.
6. "Equal Access." An arrangement where a local exchange company provides all telecommunications companies operating in an equal access central office with dialing arrangements and other service characteristics that are equivalent in type and quality to what the local exchange carrier utilizes in the provision of its service.
7. "Local Exchange Carrier." A telecommunications company that provides local exchange service as one of the telecommunications services it offers to the public.
8. "Local Exchange Service." The telecommunications service that provides a local dial tone, access line, and local usage within an exchange or local calling area.
9. "Monopoly Service." A monopoly service is any telecommunications service provided by a telecommunications company that is not subject to competition in the relevant market.
10. "Primary Interexchange Company" or "PIC." The telecommunications company with whom a customer may presubscribe to provide 1+/0+ toll service, without the use of access codes, following equal access implementation.
11. "Rate." Within the context of this Article, this term refers to the maximum tariffed rate approved by the Commission, from which the competitive telecommunications service provided may be discounted down to the total service long-run incremental cost of providing the service.
12. "Relevant Market." Where buyers and sellers of a specific service or product, or a group of services or products, come together to engage in transactions. For telecommunications services, the relevant market may be identified on a service-by-service basis, a group basis, and/or by geographic location.
13. "Staff." The staff of the Arizona Corporation Commission or its designated representative or representatives.
14. "Tariffs." The documents filed with the Commission which list the services and products offered by a telecommunications company and which set forth the terms and conditions and a schedule of the rates and charges for those services and products.
15. "Telecommunications Company." A public service corporation, as defined in the Arizona Constitution, Article 15, § 2, that provides telecommunications services within the state of Arizona and over which the Commission has jurisdiction.
16. "Telecommunications Service." Any transmission of interactive switched and non-switched signs, signals, writing, images, sounds, messages, data, or other information of any nature by wire, radio, lightwave, or any other electromagnetic means (including access services), which originate and terminate in this state and are offered to or for the public, or some portion thereof, for compensation.
17. "Total Service Long Run Incremental Cost." The total additional cost incurred by a telecommunications company to produce the entire quantity of a service, given that the telecommunications company already provides all of its other services. Total Service Long-run Incremental Cost is based on the least cost, most efficient technology that is capable of being implemented at the time the decision to provide the service is made.
18. "2-PIC Toll Equal Access." The equal access option that affords customers the opportunity to select one telecommunications company for all *948 interLATA 1+/0+ toll calls and, at the customer's option, to select another telecommunications company for all intraLATA 1+/0+ toll calls.
19. "Unbundled." Disaggregation of the local exchange carrier network services.
R14-2-1103. Certificates of Convenience and Necessity Required
All telecommunications companies providing intrastate telecommunications services shall obtain a Certificate of Convenience and Necessity from the Commission, either under this Article, if competitive services are to be provided or, under Article 5. If the Commission determines that the services identified in an Application filed under this Article are not competitive, the Commission may nevertheless grant a Certificate and authorize provision of the services on a noncompetitive basis pursuant to Article 5.
R14-2-1104. Expanded Certificates of Convenience and Necessity for Telecommunications Companies with Existing Certificates; Initial Tariffs
A. Effective July 1, 1995, every telecommunications company, except a local exchange carrier, that has received a Certificate of Convenience and Necessity under Article 5, and that provides or intends to provide competitive, intraLATA telecommunications service shall file with the Docket Control Center ten copies of an Application to expand its existing Certificate of Convenience and Necessity to provide competitive, intraLATA telecommunications service. In support of the request for an expanded Certificate of Convenience and Necessity, the Application shall, at a minimum, include the following information:
1. A description of the telecommunications company and of the telecommunications services it offers or intends to offer.
2. The proper name and correct intrastate address of the telecommunications company and:
a. The full name of its owner if a sole proprietorship,
b. The full name of each partner if a partnership,
c. A full list of the officers and directors if a corporation, or
d. A full list of the members if a limited liability company.
3. A tariff for each service to be provided that states the maximum rate as well as the initial price to be charged, and that also states other terms and conditions that will apply to provision of the service by the telecommunications company. The telecommunications company shall provide economic justification or cost support data if required by the Commission or by Staff.
4. A detailed description of the geographic market to be served and maps depicting the area.
5. Appropriate city, county and/or state agency approvals, where appropriate.
6. Such other information as the Commission or the Staff may request.
B. As part of the Application for an expanded Certificate of Convenience and Necessity, the telecommunications company shall also petition the Commission for a determination that the intraLATA service being provided or to be provided is competitive, pursuant to the requirements of R14-2-1108.
C. The Commission shall review the initial tariffs submitted by the telecommunications company and shall determine whether the rates, terms, and conditions for the proposed services are reasonable.
D. If it appears, based upon Staff review or upon comments filed with Commission Docket Control Center, that a rate, term, or condition of service stated in a tariff may be unjust or unreasonable, or that a service to be offered by the applicant may not be competitive, the Commission or Staff may require further information and/or changes to the application or to the tariff.
E. When the Application is submitted to the Docket Control Center, it will not be filed until it is found to be in proper form. The telecommunications company shall, no later than 20 days after the

*949 AppendixContinued
Application is filed, publish legal notice of the Application in all counties where services will be provided. The notice shall describe with particularity the contents of the Application on file with the Commission. Interested persons shall have 20 days from the publication of legal notice to file objections to the Application and to submit a motion to intervene in the proceeding.
R14-2-1105. Certificates of Convenience and Necessity for Telecommunications Companies Offering Competitive Services; Initial Tariffs
A. Effective July 1, 1995, every other telecommunications company, except a local exchange carrier, that has not previously received a Certificate of Convenience and Necessity, and that provides or intends to provide intrastate competitive telecommunications services shall file with the Docket Control Center ten copies of an Application for a Certificate of Convenience and Necessity to provide competitive telecommunications services. In support of the request for a Certificate of Convenience and Necessity, the Application shall, at a minimum, include all the information required in R14-2-1104(A) and shall also include the following information:
1. A description of the telecommunications company's technical capability to provide the proposed services and a description of its facilities.
2. Information describing the financial resources of the telecommunications company, including:
a. A current intrastate balance sheet,
b. A current income statement (if applicable),
c. A pro forma income statement, and
d. Comparable financial information evidencing sufficient financial resources.
3. A copy of the Partnership Agreement, Articles of Incorporation, Articles of Organization, Joint Venture Agreement, or any other contract, agreement, or document that evidences the formation of the telecommunications company.
B. An Application filed under subsection (A) of this Section shall also petition the Commission for a determination that the service being provided or to be provided is competitive under the requirements of R14-2-1108.
C. An Application filed under subsection (A) of this Section shall be subject to the provisions of subsections R14-2-1104(D) and (E).
D. In appropriate circumstances, the Commission may require, as a precondition to certification, the procurement of a performance bond sufficient to cover any advances or deposits the telecommunications company may collect from its customers, or order that such advances or deposits be held in escrow or trust.

R14-2-1106. Grant of Certificate of Convenience and Necessity
A. The Commission, after notice and hearing, may deny certification to any telecommunications company which:
1. Does not provide the information required by this Article;
2. Is not offering competitive services, as defined in this Article;
3. Does not possess adequate financial resources to provide the proposed services;
4. Does not possess adequate technical competency to provide the proposed services; or
5. Fails to provide a performance bond, if required.
B. Every telecommunications company obtaining a Certificate of Convenience and Necessity under this Article shall obtain certification subject to the following conditions:
1. The telecommunications company shall comply with all Commission rules, orders, and other requirements relevant to the provision of intrastate telecommunications service.
2. The telecommunications company shall maintain its accounts and records as required by the Commission.
*950 3. The telecommunications company shall file with the Commission all financial and other reports that the Commission may require, and in a form and at such times as the Commission may designate.
4. The telecommunications company shall maintain on file with the Commission all current tariffs and rates, and any service standards that the Commission may require.
5. The telecommunications company shall cooperate with Commission investigations of customer complaints.
6. The telecommunications company shall participate in and contribute to a universal service fund, as required by the Commission.
7. Failure by a telecommunications company to comply with any of the above conditions may result in rescission of its Certificate of Convenience and Necessity.
R14-2-1107. Application to Discontinue or Abandon Local Exchange Service Area
A. Any telecommunications company providing competitive local exchange service that intends to discontinue service or to abandon all or a portion of its service area shall file an application for authorization with the Commission setting forth the following:
1. Any reasons for the proposed discontinuance of service or abandonment of service area;
2. Verification that all affected customers have been notified of the proposed discontinuance or abandonment, and that all affected customers will have access to an alternative local exchange service provider;
3. Where applicable, a plan for the refund of deposits collected pursuant to subsection R14-2-503(B);
4. A list of all alternative utilities providing the same or similar service within the affected geographic area.
B. When the Application is submitted to the Docket Control Center, it will not be filed until it is found to be in proper form. No later than 20 days after the Application is filed, the telecommunications company shall publish legal notice of the Application in all counties affected by the Application. The legal notice shall describe with particularity the substance of the Application. Interested persons shall have 30 days from the publication of legal notice to file objections to the Application, to request a hearing, and to submit a motion to intervene in the proceeding.
C. Once proper notice is effected and if no objection is filed, the Commission may grant the application without a hearing.
R14-2-1108. Determination of a Competitive Telecommunications Service
A. A telecommunications company may petition the Commission to classify as competitive any service or group of services provided by the company. The telecommunications company shall file with the Docket Control Center ten copies of its petition. The telecommunications company also shall provide notice of its application to each of its customers, if any, and to each regulated telecommunications company that serves the same geographic area or provides the same service or group of services, or a service or group of services similar to the service or group of services for which the competitive classification is requested.
B. The petition for competitive classification shall set forth the conditions within the relevant market that demonstrate that the telecommunications service is competitive, providing, at a minimum, the following information:
1. A description of the general economic conditions that exist which make the relevant market for the service one that is competitive;
2. The number of alternative providers of the service;
3. The estimated market share held by each alternative provider of the service;
4. The names and addresses of any alternative providers of the service that are also affiliates of the telecommunications *951 company, as defined in R14-2-801;
5. The ability of alternative providers to make functionally equivalent or substitute services readily available at competitive rates, terms, and conditions; and
6. Other indicators of market power, which may include growth and shifts in market share, ease of entry and exit, and any affiliation between and among alternative providers of the services.
C. Alternatively, where the Commission has already classified a specific service within the relevant market as competitive, the petition shall provide the date and decision number of the Commission order.
D. In any competitive classification proceeding, the telecommunications company filing the petition, and any telecommunications company supporting the petition, shall have the burden of demonstrating that the service at issue is competitive. Classification of the petitioners' service as competitive does not constitute classification of any service provided by another telecommunications company as competitive, unless expressly ordered by the Commission.
E. The Commission may initiate classification proceedings on its own motion and may require all regulated telecommunications companies potentially affected by the classification proceeding to participate in the proceeding. In an Order classifying a service as competitive, the Commission will specify whether the classification applies to the service provided by a specific company or companies or to that service provided by all telecommunications companies.
F. If the Commission finds that a telecommunications company's service is competitive, the telecommunications company providing the service may obtain a rate change for the service by applying for streamlined rate treatment pursuant to R14-2-1110.
G. Any finding by the Commission, pursuant to the provisions of this Section, that a telecommunications service is competitive so as to qualify for streamlined rate treatment shall not constitute a finding that the service is deregulated.
H. Any telecommunications service classified by the Commission as competitive may subsequently be reclassified as noncompetitive if the Commission determines that reclassification would protect the public interest. Notice and hearing would be required prior to any reclassification. The burden of proof would be on the party seeking reclassification.
R14-2-1109. Pricing of Competitive Telecommunications Services
A. Pricing of Competitive Services. A telecommunications company governed by this Article may price a competitive telecommunications service at any level at or below the maximum rate stated in the company's tariff on file with the Commission, provided that the price for the service is not less than the company's total service long-run incremental cost of providing the service.
B. Changing a Price. A telecommunications company governed by this Article may effect a price change for a competitive service so long as two conditions are met:
1. The changed price comports with the limitations stated in subsection (A); and
2. The Commission is provided with concurrent, written notice of the price change.
C. No Cross-subsidization. A competitive telecommunications service shall not be subsidized by any rate or charge for any noncompetitive telecommunications services. To insure that no cross-subsidization exists, each competitive telecommunications service must provide revenues that equal or exceed the company's total service long-run incremental cost of providing the service.
R14-2-1110. Competitive Telecommunications ServicesProcedures for Rate Change
A. Telecommunications companies governed by this Article may apply to the Commission *952 for an increase in any rate for a competitive service using the procedures set forth below. All applications and supporting information shall be submitted with ten copies and filed with Docket Control Center.
B. In order to increase the maximum tariffed rate for a competitive telecommunications service, the applicant shall submit an application to the Commission containing the following information:
1. A statement setting forth the reasons for which a rate increase is required;
2. A schedule of current rates and proposed rates and the additional revenues to be derived from the proposed rates;
3. An affidavit verifying that appropriate notice of the proposed rate increase has been provided to customers of the service;
4. The Commission or staff may request any additional information in support of the application.
C. The Commission may, at its discretion, act on the requested rate increase with or without an evidentiary hearing; in an expeditious manner.
R14-2-1111. Requirement for IntraLATA Equal Access
A. Each local exchange carrier shall provide 2-PIC toll equal access where technically and economically feasible, and in accordance with any procedures the Commission may order.
B. The sequence for implementation of intraLATA equal access shall occur in the following manner:
1. In response to a bona fide request for intraLATA equal access, a local exchange carrier shall complete implementation of intraLATA equal access within nine months of receiving the request. A person making such a bona fide request shall also provide a copy to the Arizona Corporation Commission.
2. The local exchange carrier may implement intraLATA equal access in any central office on its own initiative but, in any event, shall make intraLATA equal access available in all its central offices no later than July 1, 1996, unless otherwise ordered by the Commission.
C. A local exchange carrier may petition the Commission for a waiver of the requirement in subsection (B)(1) on the grounds that compliance is not technically or economically feasible. A local exchange carrier may also petition the Commission for an extension of the requirement in subsection (B)(2) on the grounds that intraLATA equal access cannot reasonably or economically be provided within any specific exchanges within the required time frame. The Commission may grant either of these waivers with or without a hearing. The local exchange carrier filing the waiver petition shall bear the burden of proof.

R14-2-1112. Interconnection Requirements
All local exchange carriers must provide appropriate interconnection arrangements with other telecommunications companies at reasonable prices and under reasonable terms and conditions that do not discriminate against or in favor of any provider, including the local exchange carrier. Appropriate interconnection arrangements shall provide access on an unbundled, nondiscriminatory basis to physical, administrative, and data-base network components. Local exchange carriers shall provide appropriate interconnection arrangements within six months of receiving a bona fide request for interconnection. The interconnection arrangements must be in the form of a tariff and shall be filed with the Commission for its approval before becoming effective.
R14-2-1113. Establishment of Universal Service Fund
The Commission shall establish an intrastate universal service fund which shall assure the continued availability of basic telephone service at reasonable rates. The universal service fund shall be structured and administered as required by the Commission.
*953 R14-2-1114. Service Quality Requirements for the Provision of Competitive Services
A. General Requirement. Telecommunications companies governed by this Article shall provide quality service in accordance with this rule and with any other service quality requirements established by the Commission.
B. Telecommunications Company Responsibility. Each telecommunications company governed by this Article:
1. Shall be responsible for maintaining in safe operating condition all equipment and fixtures owned by and under the exclusive control of the telecommunications company that are used in providing telecommunications services to the customer.
2. Shall make known to applicants for its service and to its subscribers any information necessary to assist the subscriber or customer in obtaining adequate, efficient, and reasonably priced service.
C. Continuity of Service. Each telecommunications company providing competitive telecommunications services pursuant to this Article shall make reasonable efforts to supply a satisfactory and continuous level of service.
D. Billing and Collection.
1. Each telecommunications company governed by this Article shall bill monthly for any competitive services rendered. The following minimum information must be provided on all customer bills:
a. A description of the service provided;
b. The monthly charge for each service provided;
c. The company's toll-free number for billing inquiries;
d. The amount or percentage rate of any privilege, sales, use or other taxes that are passed on to the customer as part of the charge for the service provided;
e. Any access or other charges that are imposed by order of or at the direction of the Federal Communications Commission; and
f. The date on which the bill becomes delinquent.
2. If the telecommunications company does not provide direct billing to its customers, it shall make arrangements for monthly bills to be rendered to all its customers. However, a local exchange carrier shall not provide billing and collection services for intrastate telecommunications services to any telecommunications company that does not have a Certificate of Convenience and Necessity from the Commission, and that does not have a certification application pending before the Commission.
E. Insufficient Funds (NSF) Checks. A telecommunications company governed by this Article may include in its tariffs a fee for each instance where a customer tenders payment for the competitive telecommunications service with an insufficient funds check. When a customer tenders an insufficient check, the telecommunications company may require the customer to make payment in cash, by money order, certified check, or other means which guarantees the customer's payment to the telecommunications company.
F. Deferred Payment Plan.
1. Each telecommunications company may, in lieu of terminating service, offer any customer a deferred payment plan to retire unpaid bills for telecommunications company service. If a deferred payment arrangement is made, current service shall not be discontinued if the customer agrees to pay a reasonable portion of the outstanding balance in installments over a period not to exceed six months and agrees to pay all future bills in accordance with the billing and collection tariffs of the telecommunications company.
2. If a customer does not fulfill the terms of a deferred payment agreement, the telecommunications company shall *954 have the right to disconnect service pursuant to the Commission's termination of service rule, R14-2-509.
G. Late Payment Penalty. A telecommunications company governed by this Article may include in its tariffs a late payment penalty which may be applied to delinquent bills. The amount of the late payment penalty shall be stated on a customer's bill when rendered by the telecommunications company or its agent.
H. Service Interruptions.
1. Each telecommunications company shall make reasonable efforts to reestablish service within the shortest possible time when service interruptions occur. The telecommunications company shall issue instructions to its employees covering procedures to be followed in the event of any emergency, including national emergencies or local disasters, in order to prevent or mitigate interruption or impairment of service. The Commission shall be notified of major interruptions in service affecting the entire system or any major division.
2. When a telecommunications company plans to interrupt service to perform necessary repairs or maintenance, the telecommunications company shall attempt to inform affected customers at least 24 hours in advance of the scheduled date and estimated duration of the service interruption. Such repairs shall be completed in the shortest possible time to minimize the inconvenience to the customers of the telecommunications company.
I. Nonpermissible Termination of Service. A telecommunications company governed by this Article may not disconnect service for:
1. The failure of a customer to pay for services or equipment which are not regulated by the Commission, or
2. For disputed bills where the customer has complied with the Commission's rules on complaints.
J. Permissible Termination of Service. Termination of service without notice may occur in accordance with the provisions of subsection R14-2-509(B). Termination of service with notice shall occur in accordance with provisions of R14-2-509(C) through (E). All local exchange carriers are prohibited from discontinuing local service for alleged delinquency of non-local bills.
K. Notice of Responsible Officer or Agent. Each telecommunications company governed by this Article shall file a written statement with the Commission which provides the name, address (business, residence, and post office) and telephone numbers (business and residence) of at least one officer, agent, or one employee responsible for the general management of its operations as a telecommunications company in Arizona. Each telecommunications company shall give notice of any change in this information by filing a written statement with the Commission within five days from the date of any such change.
L. Competitive Local Exchange Service. Any telecommunications company providing competitive local exchange service shall comply with the Commission's rules for establishment of service set forth in R14-2-503.
M. Denial of Service/Noncertificated Utilities. A local exchange carrier shall deny service to a noncertificated telecommunications company that intends to use the service requested to provide telecommunications service for hire, sale, or resale to the general public within the state of Arizona. Service shall not be denied if the telecommunications company has an Application for a Certificate of Convenience and Necessity pending before the Commission.

R14-2-1115. Administrative Requirements
A. Customer Service Complaints. All customer service complaints concerning competitive telecommunications services shall be governed by the provisions of subsection R14-2-510(A).
*955 B. Customer Bill Disputes. All customer bill disputes concerning competitive telecommunications services shall be governed by the provisions of R14-2-510(B) and (C).
C. Filing of Tariffs, Price Levels, and Contracts. Each telecommunications company governed by this Article shall file with the Commission current tariffs, price levels, and contracts that comply with the provisions of this Article and with all Commission rules, orders, and all other requirements imposed by the laws of the state of Arizona.
1. Current tariffs for competitive services shall be maintained on file with the Commission pursuant to the requirements of A.R.S. § 40-365.
2. Current price levels for competitive services shall be filed with the Commission pursuant to the requirements of R14-2-1109(B).
3. Contracts of telecommunications companies governed by this Article shall be filed with the Commission not later than five business days after execution. If the contract includes both competitive and noncompetitive services, it must be filed at least five business days prior to the effective date of the contract and must separately state the tariffed rate for the noncompetitive services and the price for the competitive services.
4. Contracts filed pursuant to this Article shall not be open to public inspection or made public except on order of the Commission, or by the Commission or a Commissioner in the course of a hearing or proceeding.
D. Accounts and Records.
1. Each telecommunications company shall keep general and subsidiary accounting books and records reflecting the cost of its intrastate properties, assets and liabilities, operating income and expenses, and all other accounting and statistical data which reflect complete, authentic, and accurate information regarding its properties and operations. These accounting records shall be organized and maintained in such a way as to provide an audit trail through all segments of the telecommunications company's accounting system.
2. With the exception of local exchange companies, each telecommunications company providing competitive telecommunications services shall maintain its books and records in accordance with Generally Accepted Accounting Principles as promulgated by the Financial Accounting Standards Board and its successors, as amended by any subsequent modification or official pronouncement thereto, which directly relates to regulated industries.
E. Production of Accounts, Records, and Documents.
1. All telecommunications companies governed by this Article shall immediately make available, at the time and place the Commission may designate, any accounting records that the Commission may request. Accounting records shall include all or any portion of a telecommunications company's formal and informal accounting books and records along with any underlying and/or supporting documents regardless of the physical location of such books, records, and documents. Accounting records shall also include all books, records or documents which specifically identify, support, analyze, or otherwise explain the reasonableness and accuracy of affiliated interest transactions.
2. The Commission, at its sole discretion, may inspect any telecommunications company's formal and/or informal accounting books, records, and documents at the company's business premises or at its authorized representative's business premises which may be outside the state of Arizona. If inspection of the telecommunications company's accounting records does take place outside the state of Arizona, the telecommunications company will, to the extent legally permissible, assume all reasonable costs of travel, *956 lodging, per diem, and all other miscellaneous costs incurred by participating personnel employed by the Commission or personnel contracted to represent the Commission in any manner.
F. Annual Reports to the Commission. All telecommunications companies providing competitive telecommunications services pursuant to this Article shall submit an annual report to the Commission which shall be filed on or before the 15th day of April for the preceding calendar year.
1. The annual report shall be in a form prescribed by the Commission and, at a minimum, shall contain the following information:
a. A statement of income for the reporting year similar in format to R14-2-103, Schedule (C)(1) or (E)(2). The income statement shall be Arizona-specific and reflect operating results in Arizona.
b. A balance sheet as of the end of the reporting year similar in format to R14-2-103, Schedule (E)(1). The balance sheet shall be Arizona-specific.
2. Annual reports filed pursuant to this Article shall not be open to public inspection or made public except on order of the Commission, or by the Commission or a Commissioner in the course of a hearing or proceeding.
G. Reports to the Securities and Exchange Commission. All telecommunications companies shall file with the Commission a copy of all reports required by the Securities and Exchange Commission.
H. Other Reports. All telecommunications companies shall file with the Commission a copy of all annual reports required by the Federal Communications Commission and, where applicable, annual reports required by the Rural Electrification Administration or any other agency of the United States.
I. Variations, Exemptions of Commission Rules. The Commission may consider variations or exemptions from the terms or requirements of any of the rules included herein (14 A.A.C. 2, Article 11) upon the verified application of an affected party. The application must set forth the reasons why the public interest will be served by the variation or exemption from the Commission rules and regulations. Any variation or exemption granted shall require an order of the Commission. Where a conflict exists between these rules and an approved tariff or order of the Commission, the provisions of the approved tariff or order of the Commission shall apply.
NOTES
[*] Justice Feldman recused himself and did not participate in the determination of this matter.
[1] "LATA" stands for "Local Access and Transport Area." LATAs were established as a result of the AT&T divestiture. See United States v. Western Elec. Co., Inc., 569 F.Supp. 990 (D.D.C. 1983); United States v. Western Elec. Co., Inc., 569 F.Supp. 1057 (D.D.C.), aff'd sub nom. California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983) (mem.). Under the divestiture decree, all Bell telephone territory was divided into LATAs, generally centering upon a city or other identifiable community of interest. See Western Elec. Co., 569 F.Supp. at 993-94. Arizona has two LATAs, the Phoenix LATA and the Tucson LATA. See id. at 1050. Telephone "calls placed within any one LATA may still be either `local' or `toll' depending upon the requirements or rates established by state regulators." Id. at 995. U S WEST has been permitted to provide intraLATA long distance service, but not interLATA service. For further discussion of the differences between interLATA and intraLATA services, see U.S. West Communications, Inc. v. Arizona Department of Revenue, 193 Ariz. 319, 972 P.2d 652 (App.1998).
[2] In February of 1996, Congress enacted the Telecommunications Act of 1996, mandating competition in the telecommunications industry. Pub.L. No. 104-104, 110 Stat. 56 (1997). Under the Act, states are prohibited from creating or maintaining barriers to entry in the telecommunications market. See 47 U.S.C. § 253(a) (West Supp.1998).
[3] U S WEST also asserts that the Commission conceded in the trial court that the relationship is a "compact," which it argues is synonymous with a contract. See Farish v. Cieneguita Copper Co., 12 Ariz. 235, 239, 100 P. 781, 782 (1909); Jaramillo v. Champagne Pools of Ariz., Inc., 125 Ariz. 398, 400, 609 P.2d 1098, 1100 (App.1980). As discussed below in ¶¶ 18-24, we disagree.
[4] Corbin dealt with A.R.S. section 41-1041, which has been repealed. Laws 1994, Ch. 363, § 21. Its substance is now contained in section 41-1044, which was enacted simultaneously with the repeal of section 41-1041. Laws 1994, Ch. 363, § 22.
[5] U S WEST argues that we should ignore the Commission's citation of Corbin in its answering brief because it did not cite that case during the proceedings leading to the rules' promulgation. However, although its order did not specifically do so, the Commission cited Corbin in determining that it need not undergo the attorney general approval process. See Editor's Note in the Arizona Administrative Code in the Appendix to this opinion.
[6] We agree with the Commission, however, that Rule R14-2-1104(C), which provides for the Commission to review and determine the reasonableness of initial tariffs, does reasonably relate to ratemaking. Likewise, Rule R14-2-1104(D) provides for the Commission to review rates and terms or conditions of service.
[7] In Tonto Creek, the Commission ordered the unilateral transfer of a CC&N from one entity to another. 177 Ariz. at 55, 864 P.2d at 1087. We held that the Commission did not have jurisdiction to issue such an order without first complying with A.R.S. section 40-252, which states that "[t]he commission may at any time, upon notice to the corporation affected and after opportunity to be heard as upon a complaint, rescind, alter or amend any order or decision made by it." See id. at 56, 864 P.2d at 1088.
[8] To recap, the following rules were subject to attorney general review, and because they were not reviewed, they are invalid until such review takes place: Rules R14-2-1103 through -1106, except Rule R14-2-1104(C) and R14-2-1104(D) as previously discussed in footnote 6; Rule R14-2-1111; R14-2-1112; R14-2-1114; and R14-2-1115 (A)-(C), (G)-(I).
[1] Rule R14-2-1102, as adopted by Commission in Decision No. 59124, begins: "In this Article,..." The first two words are omitted in the Arizona Administrative Code.